IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs January 8, 2002

## STATE OF TENNESSEE v. ROBIN DAVIS

**Direct Appeal from the Criminal Court for Shelby County**
**Nos. 99-05481, 99-00752     John P. Colton, Jr., Judge**

---

**No. W2000-03137-CCA-R3-CD  - Filed March 25, 2002**

---

The defendant was convicted of first degree premeditated murder and theft over $1000, receiving a life sentence for the murder conviction and a consecutive two-year sentence for the theft conviction.  Following the denial of his motion for a new trial, he filed a timely notice of appeal to this court.  In addition to challenging the sufficiency of the evidence as to his murder conviction, he argues that the trial court erred by allowing the prosecutor to misstate law during voir dire; in not allowing defense counsel to question potential jurors about their personal experiences with crime; in allowing hearsay evidence to be presented at trial; in allowing the State to introduce evidence of uncharged crimes; and in allowing the prosecutor to make improper statements during closing argument.  Based upon our review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which DAVID G. HAYES and JOE G. RILEY, JJ., joined.

Leslie I. Ballin, Memphis, Tennessee, for the appellant, Robin Davis.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Lorraine Craig, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The defendant, Robin Davis, was convicted by a Shelby County Criminal Court jury of first degree premeditated murder for killing the victim, fifty-seven-year-old Carroll Holman, and of theft of property over $1000 but under $10,000, for stealing the victim's 1984 GMC pickup truck.  The following issues are presented in the defendant's appeal:

> I.      Whether the trial court erred during voir dire by allowing State's counsel to tell the potential jurors that premeditation

can be formed in an instant and that the burden of proof is on the Defendant to prove self-defense;

II. Whether the trial court erred during voir dire by refusing to allow defense counsel to question potential jurors about their personal experiences with crimes;

III. Whether the verdict was contrary to the evidence that was adduced at trial in that the evidence, considered in its totality, preponderated in favor of the innocence of the accused rather than his guilt;

IV. Whether the trial court erred by allowing State's witness, Eunice Holman, to testify to two distinct hearsay statements without an evidentiary exception;

V. Whether the trial court erred by allowing the State to introduce evidence of other crimes for which the Defendant was not charged, where the Defendant was found at [the] time of his arrest in possession of a brown bag containing marijuana, scales and gloves, and where Defendant gave a formal statement to police wherein he made reference to those items;

VI. Whether the trial court erred by allowing the State to make improper statements during closing argument, where counsel was allowed to describe voluntary manslaughter as when a parent reacts after witnessing their child being raped, and where counsel implied that Defendant had already given a statement although he did not testify at trial.

## FACTS

On the morning of May 16, 1998, the victim and his wife were awakened by the sound of the engine starting in their pickup truck. Looking out the balcony of their bedroom, they saw the defendant sitting in the driver's seat, backing the truck out of their driveway. When the victim yelled, the defendant got out of the truck and ran. Telling his wife to stay inside, the victim took off in pursuit, driving the couple's Toyota Corolla and taking his pistol with him. Soon thereafter, neighbors heard gunshots and discovered the victim on the ground beside the open driver's door of his car, dying from a gunshot wound to the chest. The defendant admitted in a statement to police that he had shot the victim, but claimed that it was only after the victim had first tried to rob and shoot him.

The defendant's trial was held from January 18-22, 2000. The victim's widow, Mrs. Eunice Holman, testified that she and the victim were awakened by the sound of their truck's engine at 6:45 or 6:46 a.m., and that it was approximately fifteen minutes later, as she was walking down the street in search of her husband, when someone came to tell her that he had been shot. She had been aware that her husband owned a gun but had not known where he kept it, and had not seen him retrieve it as he left the house. According to Mrs. Holman, the victim was not known to carry a weapon. She testified that the defendant was dressed in a white shirt and blue jeans, and was carrying a brown bag under his arm. On cross-examination, she said that she had not telephoned the police when she saw the defendant breaking into the truck.

Edward L. Matthews, Jr., the victim's neighbor, testified that he was putting oil in his car on the morning of May 16, 1998, when the victim, dressed in a nightshirt and nightcap, pulled up in front of his house. The victim said that a bald-headed man dressed in a white T-shirt and dark pants had just tried to steal his truck, and asked if he had seen anyone matching that description. Matthews replied that he had not. The victim then said that if Matthews saw the man, he should not do anything other than call the police. Matthews testified that he spoke with the victim for four or five minutes and that the victim did not appear to be enraged. As he talked with the victim, he saw a pistol lying on the passenger seat of the victim's car. A few minutes after the victim drove away, Matthews heard "about seven shots." He described the sounds he heard as "pow-pow, pow-pow-pow-pow[,]" indicating that he heard two gunshots, followed by a slight hesitation, and then more gunshots. After hearing the gunshots, he drove his car to the intersection of Finley and Boeingshire, where he discovered the victim lying in the street beside his Toyota. The driver's door was open, and the left rear passenger window was shattered. Matthews said that the victim took one breath, "and that was it."

On cross-examination, Matthews acknowledged that the victim had not asked him to immediately telephone the police. He further acknowledged that, in a statement to police, he had said that he had at first thought he heard "about ten shots[.]" On redirect, Matthews testified that it is possible to hear echoes from a gunshot, and that it could have been more or less than seven shots that he heard fired.

Roger Brown, who lived at 1986 Finley, testified that he and his wife were awakened on the morning of the murder by a series of gunshots that sounded as if they were coming into their front room. He said that he heard one gunshot, which woke him, followed by a hesitation, and then four more shots, which sounded "like pow, pow-pow-pow-pow." From their kitchen window, he and his wife could see a vehicle in the street outside their house, and a man lying on the ground beside it. After calling 911, he ran outside, where he found the victim lying face down beside the open driver's door of his vehicle. The victim did not appear to be breathing and had no detectable pulse. Brown said that he looked in the victim's car as he waited for the police and ambulance to arrive, and saw a pistol lying on the passenger seat. On cross-examination, Brown acknowledged that he could not be sure exactly how many gunshots he heard.

-3-

Vincent Gordon, who lived with his godmother at 4403 Boeingshire, testified that he was awakened by the sound of "seven to eight shots" on May 16, 1998. When he looked outside, he saw the defendant, who was carrying a brown bag and a gun, climb a fence into a neighbor's yard and then run through the yard and down Boeingshire toward Shelby Drive. After watching the defendant run down the street, Gordon went with his godmother to the corner of Finley and Boeingshire, where he saw the victim lying face down on the ground beside the open driver's door of his vehicle. He said that the left rear passenger window was shattered, and that he saw a gun lying on the front passenger seat of the vehicle. On cross-examination, he acknowledged that in the statement he gave to police immediately after the shooting, he had estimated the number of gunshots he had heard as "[n]ine to ten."

Gordon's godmother, Joyce Franklin, testified that she was on the way to her laundry room on the morning of May 16, 1998, when she was startled by the sound of "a lot of gunshots[.]" When she went outside, she saw a man across the street carrying a brown bag and a nickel-plated revolver "darting in and out from house to house[,]" and then heading down Boeingshire toward Shelby Drive. She later directed a police officer to the area in which she had seen the man run.

Memphis Police Officer Robert Lee Thompson testified that he discovered the defendant, dressed in a white t-shirt "spackled with blood," walking southbound on Boeingshire approximately 100 yards from Shelby Drive, and that he placed him under arrest. When the defendant asked why he was being arrested, Officer Thompson told him that it was because he fit the description of a shooting suspect. Officer Thompson testified that the defendant first tried to convince him he had the wrong man, and then told him that the victim had tried to rob him. On cross-examination, Officer Thompson acknowledged that the defendant had said the victim had tried to rob and shoot him, and that was the reason he shot the victim. Officer Thompson further testified that he found marijuana and money in the defendant's pocket, and a pistol and a brown bag containing marijuana underneath a tractor trailer truck, approximately ten or fifteen feet from where he arrested the defendant.

Captain Phil Nason, a crime scene investigator who processed the scene of the shooting, testified that there was blood on the side of the driver's seat of the victim's car, on the bottom of the seat, and on the headrest. He also found blood on the outside of the car, smeared down the side of the vehicle near the gas tank, and on the ground beside the driver's side rear wheel, near the victim's bloody nightcap and houseshoe. A six-shot .357 Smith and Wesson revolver, with six empty casings in the cylinder, was lying on the front passenger seat. Captain Nason could not determine when the weapon had last been fired. To his knowledge, a gunshot residue test was not performed on the victim. He testified that the window of the driver's door of the vehicle was down, and that he had not fingerprinted the pistol.

Memphis Fire Department Paramedic Bradford Denham testified that the victim was not breathing and had no pulse when he arrived at the scene. Emergency workers performed resuscitation procedures and transported him to the hospital, but the victim's breathing and heartbeat were never restored.

Officer Shan Alan Tracy of the Crime Scene Unit identified the brown bag and the pistol that were recovered from underneath the tractor trailer truck. He testified that the brown bag contained, among other items, 16.7 grams of marijuana, and that the gun was a six-shot Smith and Wesson .38 revolver that contained five spent casings and one live round.

Lieutenant Edward Cash testified that the defendant was brought to his office on May 16, 1998, where he read him his rights and had him sign a waiver of rights form before taking his statement. Lieutenant Cash identified the defendant's signed statement, which was introduced into evidence, and read it aloud for the jury. When asked why he shot the victim, the defendant explained:

> I was walking down Boeingshire and he pulled up in a blue like faded like purple newer model small car like Nissan or Toyota Tercel and he asked me what was my name and what was I doing and asked me to stop. I stopped and he pulled his pistol and I started running and he started shooting. I fell, got up and seen the blood on my shirt and I thought I had been shot. I got up and opened my eyes and he was still shooting. I closed them and I opened them back up and I had my gun in my hand and like a rush, I was shaking and the gun was smoking.

Later in his statement, when asked why he thought the victim shot at him, the defendant answered, "I didn't feel he had a reason but I did try to steal his truck." The defendant explained that he had needed transportation because he feared he would be robbed for the money and marijuana that he was carrying.

Sergeant Sammie Harold Ballard testified he was present with Dr. O.C. Smith and Paulette Sutton on May 18, 1998, when they examined the victim's vehicle at the Crime Scene Office. He said that both the driver's and front passenger's windows of the vehicle were down, and agreed that it would have been possible for someone in the driver's seat to shoot out either side without doing damage to the vehicle.

Dr. Cynthia Gardner, the Assistant Medical Examiner for Shelby County, performed the autopsy of the victim's body. She testified that the victim was killed by a distant gunshot wound in which the bullet entered his body on his left upper arm, traveled through his chest, breaking his first rib, severing his left carotid artery, and lacerating his esophagus, and came to rest in a muscle on the right side of his neck. The victim also suffered abrasions on his nose, brow, cheek, upper lip, and chin, consistent with the pattern caused by a person who falls on his face while unconscious. Dr. Gardner estimated that a person with a severed carotid artery would lose consciousness in "under a minute[,]" and that someone with the type of injuries that the victim suffered would, without medical intervention, die within a few minutes. From her examination of the wound track, she determined that the victim's arm was down at his side when he was shot. She could not, however,

tell in what position the victim's arm had been at any time other than the instant he was shot. Dr. Gardner explained that she had not performed a gunshot residue test on the victim to try and determine if he had fired the pistol because she was aware that the victim had handled a gun, which, in itself, would have caused a positive gunshot residue test result. Additionally, she said that since gunshot residue on the victim's hands could have come off during the resuscitation efforts that were made on his behalf, the absence of such residue would not necessarily mean that he had not fired his weapon. Finally, a positive result could result from his being in the vicinity of a weapon being fired. Accordingly, Dr. Gardner could not say whether the victim had fired his pistol.

Dr. O'Brian Cleary Smith, the interim Medical Examiner for Shelby County, testified that he recovered two bullet fragments from the victim's car – one from the doorpost between the front and rear doors on the right side of the vehicle, and another from the right rear passenger door. His investigation led him to conclude that both bullets came from outside the vehicle. He said that the bullet recovered from the doorpost entered from the left side of the vehicle, through the left rear passenger door, while the bullet recovered from the right rear door entered from the right side of the vehicle. Based upon his observation and participation in the autopsy of the victim, Dr. Smith agreed that the victim's arm had been down at his side at the moment he was shot. He acknowledged on cross-examination that he could not determine in what position the victim's arm had been at any other time.

Tennessee Bureau of Investigation Firearms Expert Robert Daniel Royse conducted tests on the weapons, bullets, and bullet casings involved in the shooting. He testified that he had been able to conclusively determine that the bullets recovered from the victim's body and from the right rear door of the vehicle had been fired from the weapon that was identified as the defendant's. The third bullet, recovered from the right rear door trim, was too mutilated for him to conclusively identify its source, and he had been unable to exclude either gun as having fired that bullet. The bullet was, however, inconsistent with bullet casings found in the victim's gun, while consistent with at least some of the casings found in the defendant's gun.[1] Although Royse could determine that the victim's gun had not been cleaned since the last time it was fired, he could not determine when it had last been fired. According to his testimony, there is no scientific way to determine how long it has been since a weapon has been fired.

The State's final witness was Paulette Sutton, an expert in forensic serology and bloodstain pattern interpretation. She testified that her examination of the victim's car and of photographs of the crime scene led her to conclude that the victim was seated in an upright position in the driver's seat, with the driver's door closed, when he was shot. Because the victim would have been bleeding "profusely" from his wound, and she found no evidence of blood anywhere inside the car other than

---

[1] Royse testified that the mutilated bullet was "consistent in design" with either Remington or Winchester ammunition. Of the five spent casings and one live round in the defendant's gun, four were Federal, one was Remington, and one was Winchester. The spent casings in the victim's gun were all manufactured by Smith and Wesson.

on the driver's seat and on the inside of the driver's door, she concluded that the victim came directly out of the driver's door after he was shot.

No witnesses were presented on behalf of the defendant.

## ANALYSIS

### I & II.  Voir Dire

The defendant contends in his first two issues that the trial court erred by the manner in which it allowed voir dire of the jury to be conducted.  He argues that the trial court allowed the prosecutor to misstate the law by telling potential jurors that premeditation may be formed in an instant and that the burden to prove self-defense was on the defendant, and improperly denied defense counsel's request to question potential jurors about their personal experiences with crime.  Without conceding that the prosecutor misstated the law, the State argues that any prejudice which may have resulted from the prosecutor's remarks was cured by the trial court's instructions to the jury.  The State further argues that the trial court did not abuse its discretion in limiting the scope of defense counsel's questions to the potential jurors.  We agree with the State.

The purpose of voir dire is to ensure that jurors seated at trial are competent, unbiased, and impartial.  See State v. Mann, 959 S.W.2d 503, 533 (Tenn. 1997), cert. denied, 524 U.S. 956, 118 S. Ct. 2376, 141 L. Ed. 2d 743 (1998).  The trial court is granted broad discretion to decide the manner in which voir dire will be conducted, and its decisions in this regard will not be disturbed on appeal absent a showing of abuse of discretion.  See State v. Stephenson, 878 S.W.2d 530, 540 (Tenn. 1994).  We review the defendant's first two issues, therefore, under an abuse of discretion standard.

### A.  Alleged Misstatements of Law

As his first issue, the defendant contends that the prosecutor erroneously informed potential jurors during voir dire that premeditation may be formed in an instant, and that the burden of proof to prove self-defense is on the defendant.  He argues that the prosecutor's statements "clearly prejudiced" his case, and asserts that neither misstatement was cured by the trial court.

During voir dire, the prosecutor read, although not identifying it as such, the pattern jury instruction then in effect for "premeditation."[2]  Following her reading of the pattern jury instruction, the prosecutor then made comments which drew objections from the defendant:

---

[2]T.P.I. - Crim. 7.01(b) (5th ed.) states, in part, that "[p]remeditation means that the intent to kill must have been formed prior to the act itself.  It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time."

So you have an intent to kill that's done after you make a decision to do it. You think about it, you decide to do it, and you take the act to do it. That is premeditated murder.

And there are a couple of things in there I'd like to point out to you. One, the decision to kill does not have to exist for any prescribed time. It could be weeks, it could be hours, it could be minutes, it could be seconds, as long as you have made a decision and then you take the act to do it.

MR. BALLIN: Judge, may we approach?

THE COURT: Yes.

(A bench conference was held as follows.)

MR. BALLIN: I want to voice an objection to this line of questioning. It's my recollection–it's been a while since I read Mack Brown, but I think Mack Brown did away with premeditation being formed in an instant as Ms. Craig is describing it. I wanted to voice that objection now.

MS. CRAIG: Well, Judge, I'd just say that actually what the case says is exactly that, there's no prescribed amount of time and that's all I'm saying. As long as there is time to make a decision and to act on it and that's all it says.

MR. BALLIN: I don't have any objection with that comment but it was going further to get it down to seconds. It's up to the jury to decide.

MS. CRAIG: It is up to the jury, Judge, but there's nothing improper in what I said.

THE COURT: Well, I'm going to hit the jury probably several times before the trial is over with that the fact that what y'all say is good and nice and all that but they take the law from me. So I think we can cure it that way. And you can come back on your voir dire.

MS. CRAIG: Thank you, Judge.

(Said bench conference was concluded.)

MS. CRAIG: So as I was saying, it does not have to exist in the mind of the killer for any length of time prescribed by law. Does everybody understand that?

(No response.)

As long as you can think about it, make a decision to do it, and then do it.

Very shortly thereafter, as the prosecutor discussed the possibility that the jury would be charged on self-defense, the following exchange occurred:

Included in a plea of not guilty may be the defense of self-defense. And the judge is going to instruct you on self-defense. And I am not going to go into everything on that charge. So if the judge instructs you on self-defense, there are going to be several things, several hurdles someone has to overcome who is claiming self-defense. It's not a –

MR. BALLIN: Objection, Your Honor.

THE COURT: All right.

MR. BALLIN: May we approach?

THE COURT: Yes, sir.

(A bench conference was held as follows.)

MR. BALLIN: I object to that question as a misstatement of the law. The burden of proof is always on the State and if the proof is such that the court decides that it is fairly raised, then the State must prove really that it did not occur in self-defense beyond a reasonable doubt. And that's the law.

MS. CRAIG: No, that's not the law. If he's relying on a defense, there has to be credible proof in the record to that defense. I don't have to prove the absence of self-defense. I don't have to prove the absence of any defense. I don't have to prove the absence of alibi defense.

I mean, you can't just say–and all I'm going to say about self-defense, keeping in mind the judge's instruction as to your taking all

of these matters under advisement, is there has to be proof raised that there was force used by the victim, that his actions were reasonable under the circumstances, and he didn't provoke it. All three things listed, one, two, three in that charge.

THE COURT: Well, I think we might be getting a little bit into argument here. Using the law and telling them about the law and getting into argument because we don't know whether I'm going to charge self-defense–

MS. CRAIG: Right. And that's what I said to them, Judge.

THE COURT: And if you try to restrict the jury at this point, it's going to be difficult. You might just get into the fact that it may or may not be charged.

MS. CRAIG: All right. And –

THE COURT: And generally what it's about. I think you might need to save that till final argument. If the court does desire or does in fact charge it, we can get into it. At this point this is getting a little bit outside of voir dire on that type situation.

(Said bench conference was concluded.)

MS. CRAIG: And if [sic] the judge may, as I said earlier, may or may not charge self-defense, and if he does charge self-defense, I think in his charge will be things that have to be raised by the proof before you can find someone not guilty by self-defense.

MR. BALLIN: Same objection. That's an improper comment of the –

MS. CRAIG: Judge, it is not. And I would appreciate going up to the bench instead of doing what is completely improper in accusing me of improper conduct in front of the jury.

THE COURT: All right. Here's what we're going to do. Now, lawyers we're going to do this. I'm going to let the State go ahead and say what they want to say but, jurors, the statements and arguments of these lawyers are intended to help you in understanding the evidence and applying the law in the case but they are not evidence. And if any statements were made that you believe are not

supported by the evidence, you may and should disregard them. Do you understand?

(No response.)

All right. Go ahead.

MS. CRAIG: Thank you, Judge. And, again, Judge Colton will instruct you on the law, and if he instructs you on something differently than I tell you now, it will be your duty to disregard what I've said and to go with what the judge instructs you.

The first specific statement by the prosecutor during voir dire to which the defense objected was that "the decision to kill does not have to exist for any prescribed time. It could be weeks, it could be hours, it could be minutes, it could be seconds[.]"

The defendant argues that the prosecutor's remarks improperly suggested to the jury that premeditation may be formed in an "instant," ignoring the fact that the prosecutor's actual statement was, in part, that "the decision to kill . . . [could] exist for . . . seconds." However, Webster's Third International Dictionary 1171 (1993) defines "instant" as "an infinitesimal space of time," which is clearly less than "seconds." To support his argument, the defendant cites State v. Brown, 836 S.W.2d 530 (Tenn. 1992), in which our supreme court held that the element of deliberation requires "time to reflect." Id. at 540. However, the defendant's reliance on Brown is misplaced. The murder statute in effect at the time of the killing in Brown included elements of both premeditation, which our supreme court recognized may "arise instantaneously," id., and deliberation, which the court determined, "*cannot* be formed in an instant." Id. at 543 (emphasis in original). In order to avoid confusion, and to ensure that juries considered both elements, the Brown court concluded that it would be prudent to abandon the jury instruction that "premeditation may be formed in an instant." The court explained:

> It is consistent with the murder statute and with case law in Tennessee to instruct the jury in a first-degree murder case that no specific period of time need elapse between the defendant's formulation of the design to kill and the execution of that plan, but we conclude that it is prudent to abandon an instruction that tells the jury that "premeditation may be formed in an instant." Such an instruction can only result in confusion, given the fact that the jury must also be charged on the law of deliberation. If it was not clear from the opinions emanating from this Court within the last half-century, it is now abundantly clear that the deliberation necessary to establish first-degree murder *cannot* be formed in an instant.

Id. (emphasis in original).

-11-

The defendant in the instant case was charged under the statute that is currently in effect in Tennessee, which no longer includes the element of deliberation. See Tenn. Code Ann. § 39-13-202(a)(1) (1997) (defining first degree murder as "[a] premeditated and intentional killing of another"). The prosecutor's remarks in this case on intent and premeditation were consistent with both the statutory provision on first degree murder, see Tenn. Code Ann. § 39-13-202(d) (1997) ("It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time."), and with case law. See State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000) (recognizing that element of premeditation "is capable of instantaneous formation"); Brown, 836 S.W.2d at 540 ("intent (and perhaps even premeditation) may . . . arise instantaneously"). We note further that no claim was made that the trial court did not instruct the jury properly as to the homicide charge. Thus, we conclude that the prosecutor did not misstate the law as the defendant argues, but, even if this were the case, the error was harmless.

The prosecutor's remarks on self-defense are more problematic. Among the elements that the State must prove beyond a reasonable doubt in order to convict someone of an offense in Tennessee is "[t]he negation of any defense to an offense . . . if admissible evidence is introduced supporting the defense[.]" Tenn. Code Ann. § 39-11-201(a)(3) (1997). If evidence exists to warrant an instruction on self-defense, the burden is on the State, and not the defendant, to show that the defendant does not meet the requirements for the defense. See State v. Robert Lee Pattee, No. M2000-00257-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 329, at *41-42 (Tenn. Crim. App. May 3, 2001). In this case, the prosecutor's initial statement that there were "several hurdles" for the defendant to overcome could have been interpreted by the jury as placing the burden on the defendant to prove self-defense. However, any error that may have resulted was immediately cured by the trial court's instruction that the jury was not to consider the statements of the attorneys as evidence, followed by the prosecutor's reminder that the trial court would provide the appropriate law. In addition to the trial court's instruction, which it repeated at least once during voir dire, defense counsel later read the venire members the pattern jury instructions on self-defense. At the conclusion of the trial, the trial court repeated that the law was to come from the court and charged the jury on self-defense, including the appropriate instructions on the burden of proof.[3] We may presume that the jury followed the instructions of the trial court, see State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998), and, doing so, conclude that this issue is without merit.

## B. Questions Allowed on Voir Dire

The defendant raises as his second issue whether the trial court erred by refusing to allow defense counsel to question venire members regarding their personal experiences with crime. Several of the venire members indicated during voir dire that they had been victims of crimes. With no objection raised by the prosecutor, defense counsel elicited from each of these members specific

_____

[3] The actual jury charge was not transcribed in the case, but a copy of the jury instructions was included in the technical record.

information about the nature of the crimes, when they had occurred, and how the venire members had reacted, including whether or not they had called the police. During defense counsel's questioning, one of the venire members revealed that, after calling the police when he discovered that his house had been burglarized, he had, himself, gone down the street to get one of the men who had perpetrated the crime. When defense counsel asked the potential jury member if he had taken a gun with him, the prosecutor objected, arguing that defense counsel was improperly attempting to weave the facts of the defendant's case into his voir dire. Asked by the trial court how far he intended to go with his questions, defense counsel responded that he was "going to go further[,]" and suggested that the trial court let him ask the members "this question. And that is, if they were the victim of a crime, what is the preferable response, to call the police, [or] take matters in their own hands." The trial court refused the request, limiting the scope of defense counsel's questions to "what [the venire members] did when they discovered a crime."

We find no abuse of discretion by the trial court in this matter. Although Rule 24(a) of the Tennessee Rules of Criminal Procedure provides that the trial court "shall permit questioning by the parties for the purpose of discovering bases for challenge for cause and enabling an intelligent exercise of peremptory challenges[,]" the trial court, in its discretion, "controls the questions that can be asked to keep the voir dire within relevant bounds." State v. Richard Hale Austin, No. W1999-00281-CCA-R3-DD, 2001 Tenn. Crim. App. LEXIS 162, at *61 (Tenn. Crim. App. Mar. 6, 2001). In spite of the manner in which the defendant frames this issue on appeal, the record shows that he was allowed to extensively question potential jurors regarding their personal experiences with crime, including what their individual reactions had been. The answers to these and other questions which defense counsel and the prosecutor were allowed to ask should have been sufficient to reveal any latent biases or prejudices on the part of the jurors. We conclude, therefore, that the trial court did not impermissibly intrude upon the scope of defense counsel's voir dire examination by refusing to allow him to ask prospective jurors their opinion regarding the preferred response to a crime.

This issue is without merit.

### III. Sufficiency of the Evidence

As his third issue, the defendant challenges the sufficiency of the evidence in support of his murder conviction, arguing that the evidence was insufficient for any rational trier of fact to find him guilty of premeditated murder beyond a reasonable doubt. He concedes that he fired the shot that killed the victim but asserts that the evidence at his trial, including testimony from witnesses indicating that at least seven shots were fired, supports the conclusion that the killing occurred during an exchange of gunfire between himself and the victim, rather than as the result of premeditation and deliberation. The State argues that the evidence at the defendant's trial, viewed in the light most favorable to the State, was more than sufficient to support his conviction for first degree premeditated murder.

When the sufficiency of the convicting evidence is raised as an issue on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable

to the prosecution, *any* rational trier of fact could have found the essential elements of the offense charged beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979). See also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). This rule applies to findings of guilt based on direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. See State v. Dykes, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990).

When determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of first degree premeditated murder, which is defined as "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1) (1997). For the purposes of this offense:

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

-14-

Id. § 39-13-202(d). "'Intentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (1997).

In Tennessee, a homicide is presumed to be second degree murder, and the State bears the burden of proving the element of premeditation necessary to elevate the crime to first degree murder. See State v. West, 844 S.W.2d 144, 147 (Tenn. 1992); State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992). The presence of premeditation is a question of fact for the jury to determine based upon a consideration of all the evidence. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn.), cert. denied, 531 U.S. 967, 121 S. Ct. 401, 148 L. Ed. 2d 310 (2000). Premeditation may be inferred from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). The circumstantial evidence of premeditation must, however, be "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). The defendant asserts in his brief that a first degree murder conviction in Tennessee requires proof of premeditation and deliberation. However, as we have previously discussed, deliberation is no longer an element of first degree murder in Tennessee.

Based upon our review of the record, we conclude that the evidence in this case was sufficient for a rational trier of fact to find the defendant guilty of first degree premeditated murder beyond a reasonable doubt. Viewed in the light most favorable to the State, the evidence established that the defendant shot the victim as the victim sat in the driver's seat of his car, with his gun lying beside him on the passenger seat. Drs. Gardner and Smith both testified that the wound track revealed that the victim's arm was down at his side when he was shot. The State's bloodstain pattern expert, Paulette Sutton, found no evidence of blood on the gun or on the passenger seat of the vehicle, as would be expected had the victim reached over to set the gun down after being shot. Among the circumstances that may be indicative of premeditation are "'facts about the defendant's prior relationship and conduct with the victim from which *motive* may be inferred[.]'" State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995) (quoting 2 W. LaFave and A. Scott, Jr., Substantive Criminal Law, § 7.7 (1986)) (emphasis in original). Here, the victim's wife testified that the defendant looked straight up at her and the victim after getting out of their truck. The defendant revealed in his statement to police that he recognized the victim as the man from whom he had tried to steal a truck. Thus, there was sufficient evidence to support the State's theory that with premeditation the defendant shot the victim in order to avoid detection or arrest for his earlier crime.

The defendant contends that the evidence established that he and the victim exchanged gunfire before the victim's death, which supports a finding of second degree, rather than first degree, murder. In support of this contention, he cites testimony of witnesses indicating that at least seven shots were fired, along with the number of empty casings found in his and the victim's weapons. However, the evidence would support a finding of several possible theses.

First, we note that, although the State's firearms expert could determine that the victim's weapon had not been cleaned after its last use, he could not determine when it had last been fired. Thus, all, some, or none of the spent casings in the victim's pistol could have resulted from shots fired by the victim during the incident. The testimony does not permit a determination to be made in this regard.

Furthermore, since none of the witnesses who heard the shooting was able to testify with absolute certainty regarding the number of gunshots that were fired, the question of whether the victim fired any shots at all cannot be resolved. Edward Matthews testified that he heard "about seven shots," but admitted that it is possible to hear echoes from a gunshot, and that he could have heard more or less than seven shots. Two men who were closer to the scene of the shooting, Roger Brown and Vincent Gordon, were both asleep when the shooting began. Brown, whose home was closest to the scene, thought that he heard five gunshots but admitted that he could not be sure of the exact number. Gordon testified that he heard seven or eight, but admitted that he had earlier estimated the number as nine or ten. Gordon's godmother, Joyce Franklin, merely testified that she heard "a lot of gunshots," without indicating an exact number. This testimony, coupled with the fact that the defendant's and the victim's pistols each contained five casings, would have allowed the jury to reasonably conclude that the victim did not fire at the defendant, and that the defendant shot the victim intentionally and with premeditation.

This issue is without merit.

### IV. Hearsay Evidence

The defendant next contends that the trial court erred in allowing two separate hearsay statements into evidence. During the State's case-in-chief, Mrs. Holman testified that the victim said to her as they were awakened on the morning of his murder, "That sounds like the truck starting up[.]" When later asked why she had left her home and gone to the scene of the shooting, she explained that it was because a neighbor told her "that a man had been shot and that he was looking for . . . the family of the man whose truck had tried to be stolen." Defense counsel objected to both statements as inadmissible hearsay evidence. The trial court overruled the objections, ruling that the victim's statement fell under the excited utterance exception to the hearsay rule, and that the neighbor's statement was not offered to prove the truth of the matter asserted. We agree with the State that the trial court's rulings in this matter were proper.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay statements are generally inadmissible at trial unless they fall under one of the recognized exceptions to the hearsay rule. See Tenn. R. Evid. 802. One such exception is the "excited utterance," defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Tenn. R. Evid. 803(2). Our supreme court has turned to Tennessee Law of Evidence to explain the "twofold" rationale for admitting this kind of statement into evidence:

-16-

"First, since this exception applies to statements where it is likely there was a lack of reflection–and potential fabrication–by a declarant who spontaneously exclaims a statement in response to an exciting event, there is little likelihood, in theory at least, of insincerity. . . . Second, ordinarily the statement is made while the memory of the event is still fresh in the declarant's mind. This means that the out-of-court statement about an event may be more accurate than a much later in-court description of it."

State v. Gordon, 952 S.W.2d 817, 819-20 (Tenn. 1997) (quoting Cohen, Paine & Sheppeard, Tennessee Law of Evidence, § 803(2).1, at 532 (3d ed. 1995)). Thus, for the victim's statement in this case to fall under the excited utterance exception to the hearsay rule, it must have been made under the stress or excitement of a startling event or condition and have been related to that event or condition. See id.; State v. Land, 34 S.W.3d 516, 528-29 (Tenn. Crim. App. 2000). Mrs. Holman testified that the victim made the statement immediately upon their being awakened from sleep by the unexpected sound of their truck starting in the driveway below their bedroom. Given her testimony that she and the victim lived alone, this would have certainly been a startling event. Accordingly, we conclude that the trial court did not err in allowing the statement in under the excited utterance exception to the rule against hearsay.

We also conclude that the trial court properly admitted the second statement as relevant non-hearsay evidence. The trial transcript reveals that the State did not offer the statement to prove that the victim's truck had been stolen, but instead to show why Mrs. Holman left her home to go to the location of the shooting. The transcript further reveals that the trial court acquiesced in defense counsel's request that a limiting instruction, regarding the purpose of the evidence, be given to the jury. During the State's direct examination of Mrs. Holman, the following exchange occurred:

> Q.    And did you at some point leave your home and go to Finley and Boeingshire, the corner of Finley and Boeingshire?
>
> A.    Yes.
>
> Q.    Why did you do that? Why did you go to that location?
>
> A.    Because a person came and said they were looking for –
>
>   MR. BALLIN:  Object, Your Honor, as to what the person said.
>
>   THE COURT:  All right.  That's –
>
>   MS. CRAIG:  Judge, this is not for the truth of the matter asserted but to explain to the jury why Ms. Holman went to that area.

THE COURT:  All right. I'll allow it.

MS. CRAIG:  Thank you, Judge.

MR. BALLIN: Your Honor, would you instruct the jury that it is not being offered for the truth of the matter.

THE COURT:  This is not being offered here as – for the truth, ladies and gentlemen of the jury.  This is just to allow the case to move on.  The witness, the person who said this is not here and the objection was made because that person could not be – is not present and could – the Defense could not cross-examine or ask them questions.  But the Court's going to allow it to allow the matter – the case to move on.

So you may ask the question.

MS. CRAIG:  Thank you, Judge.

BY MS. CRAIG:

Q.    Why did you go to that location, Ms. Holman?

A.    Because I was told that a man had been shot and that he was looking for – the man that came to me said he was looking for the family of the man whose truck had tried to be stolen.

MR. BALLIN:  Judge, can I – same objection, Your Honor. We're past the point of now being --

MS. CRAIG:  Well, Judge, if we're going to have an argument, may we approach?

THE COURT:  All right.  Well, the Court's going to allow it and I think that this all happened in a sequence of events out there and I'm going to allow it and I'll note the exception of Defense.

The transcript shows that the State did not offer the neighbor's statement, or even intend to offer it, as substantive evidence of the defendant's guilt, and that the trial court, with its instruction to the jury, made it clear that the evidence was not to be considered as proof of the truth of the matter asserted. We conclude that the statement was not hearsay and that the trial court, therefore, did not err in allowing it into evidence.

This issue is without merit.

## V.  Evidence of Other Crimes

As his fifth issue, the defendant contends that the trial court erred in admitting evidence of an uncharged crime, namely, his possession of marijuana, in violation of Rule 404(b) of the Tennessee Rules of Evidence.  Rule 404(b) provides as follows:

> Other Crimes, Wrongs, or Acts.  Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait.  It may, however, be admissible for other purposes.  The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
>
> (3) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Generally, this rule is one of exclusion, and evidence that an accused has committed some other crime or bad act independent of that for which he is charged is inadmissible, even though it may be a crime or act of the same character as that for which the accused is on trial.  See State v. Howell, 868 S.W.2d 238, 254 (Tenn. 1993).  If, however, evidence that a defendant has committed a crime separate from the one for which he is being tried is relevant to some matter actually in issue in the case on trial and if its probative value is not outweighed by the danger of its prejudicial effect, the evidence may be admitted.  See id.  "Only in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character.  Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident."  State v. Drinkard, 909 S.W.2d 13, 16 (Tenn. Crim. App. 1995).

Before Officer Thompson testified in this case, the trial court held a jury-out hearing to determine the admissibility of evidence as to the defendant's possessing marijuana. The State argued that the evidence was relevant to corroborate the defendant's statement of motive, explaining why he was in the neighborhood and had attempted to steal the victim's truck, and that its probative value outweighed its prejudicial effect. Defense counsel argued that the evidence was not relevant to show motive because the defendant was not contesting the theft issues in the case. In response, the State argued that every issue was in contention unless the defendant pleaded guilty to the offense, which

he had not done.[4]  At the conclusion of the hearing, the trial court determined that the evidence was admissible under Rule 404, stating:

> All right, lawyers, thank you for your statements.  The court has heard the proof of the witness in this case, Mr. Thompson, and statements of the Defense and the State.  And the court will find under Rule 404 that the evidence of marijuana is probative and of value to the jury  in their findings in this case.  The court will also find that that's done because of what the court has heard about other statements and also the proof to this point.

> The court further will for the record state that we will enter an instruction to the jury on criminal conduct which will tell them not to use this in their deliberations if there is something deliberated at the time that we end this trial.

When the trial court has substantially complied with the requirements of Rule 404(b), this court reviews its decision to admit or exclude evidence under an abuse of discretion standard. See State v. Dubose, 953 S.W.2d 649, 652 (Tenn. 1997).  The trial court in this case conducted the appropriate jury-out hearing and stated for the record that it was finding the evidence  probative. However, the record does not reflect that the trial court made the required determination regarding the probative value of the evidence versus its prejudicial effect, if any.  Accordingly, we review this issue *de novo*, without any deference to the trial court's decision.  See id.

Based upon our review, we conclude that the trial court did not err in admitting the marijuana into evidence in this case.  The defendant told police that he had tried to steal the victim's truck because he was carrying marijuana and cash, and feared he would be robbed as he walked to his home.  The evidence was, therefore, relevant to the issue of the defendant's motive and intent. Furthermore, we find that its probative value far outweighed any prejudicial effect it may have had. The defendant's position throughout the trial was that there was an exchange of gunfire between himself and the victim, with the victim shooting at him first.  When arrested by Officer Thompson, and later in his statement at the police station, he claimed that he had shot at the victim after the victim first tried to rob and shoot him.  We therefore agree with the State that evidence showing that the defendant carried marijuana would have tended to support his theory of the case, rather than unfairly prejudice the jury against him.

Further, we note that in the defendant's opening statement, it was admitted that he "had a .38 revolver," and argued that he fired five shots with the victim firing six.  Since there was no proof that the defendant was lawfully carrying a loaded pistol, it appears that even the defense which he wanted

---

[4] With respect to the theft charge, the defendant stood mute, and the trial court, pursuant to Rule 11 of the Tennessee Rules of Criminal Procedure, entered a plea of not guilty on his behalf.

to present admitted at least a violation of Tennessee Code Annotated Section 39-17-1307, unlawful carrying or possession of a weapon.

This issue is without merit.

## VI.  Closing Argument

As his final issue, the defendant contends that the trial court erred in allowing the prosecutor to make improper comments to the jury during closing argument.  He argues that the prosecutor was allowed to provide an erroneous example of voluntary manslaughter, and improperly imply that the defendant was required to make a statement in the case.  The State argues that the prosecutor's comments were not error and, further, that any error that may have occurred was cured by the trial court's instructions to the jury.

Defense counsel objected to two portions of the prosecutor's rebuttal argument.  The first occurred as the prosecutor argued that the facts did not support a finding of voluntary manslaughter:

> Voluntary manslaughter is a killing, but the person who kills is provoked to such an extent that a reasonable person would do an irrational act.  You know, say a man walks in and sees somebody raping his child.  Would that be a provocation that a reasonable person might act and even kill?  I submit to you yes.

The second occurred as the prosecutor discussed the defendant's expression of remorse in his statement to police:  "Well, that's garbage. That's about as true as these self-serving statements he makes to the police.  And he's got to make some kind of statement to help himself, because they caught him with the murder weapon."

The standard of review for determining whether a trial court allowed too much latitude in closing argument is abuse of discretion.  See State v. Hall, 976 S.W.2d 121, 157 (Tenn. 1998) (citing State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)), cert. denied, 526 U.S. 1089, 119 S. Ct. 1501, 143 L. Ed. 2d 654 (1999).  Having reviewed the entire record, including the closing arguments of the prosecutor and defense counsel, we can find no abuse of discretion in the manner the trial court handled closing arguments in this case.  Following defense counsel's objection in each instance, the trial court immediately instructed the jury that the statements, arguments, and remarks of the lawyers were not evidence, and that it should disregard any statements that were not supported by the evidence.  At the conclusion of the trial, the court issued appropriate jury instructions, including instructions on voluntary manslaughter and on the defendant's right not to testify.

We conclude, therefore, that this issue is also without merit.

## CONCLUSION

Based on the foregoing reasoning and authorities, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE